IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MANTUA COMMUNITY PLANNERS, et al. | : | CIVIL ACTION NO. 12-4799 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al. | : | |

O'NEILL, J.                                               June 13, 2016

## MEMORANDUM

Defendants the City of Philadelphia and Jannie Blackwell move for summary judgment on all claims against them by plaintiffs Mantua Community Planners, Inc., Samantha Monroe and Reverend Dr. Andrew Jenkins. Now before me are defendants' motion (Dkt. No. 22), plaintiffs' response (Dkt. No. 23) and defendants' reply[1] (Dkt. No. 24). For the reasons that follow, I will grant defendants' motion.

## BACKGROUND

Plaintiffs Mantua Community Planners, Inc., Samantha Monroe and Reverend Dr. Andrew Jenkins claim that the City and Philadelphia City Councilwoman Jannie Blackwell subjected them to numerous constitutional deprivations in violation of 42 U.S.C. § 1983.[2] Dkt. No. 14 at ECF p. 3-16. Monroe individually asserts a negligence claim and an intentional infliction of emotional distress claim against Blackwell and the City. Id. at ECF p. 16-22.

---

[1] In their reply, defendants ask that I treat their motion as unopposed because plaintiffs filed their brief in opposition to summary judgment late. Dkt. No. 24 at ECF p. 1. I decline to do so and will still consider plaintiffs' brief.

[2] In my prior opinion addressing defendants' motion for partial judgment on the pleadings, I construed counts I, II and III of plaintiffs' complaint to collectively assert violations of plaintiffs' civil rights under 42 U.S.C. § 1983. See Dkt. No. 11 at ECF p. 2-3. As plaintiffs' amended complaint retains the same format as their initial complaint, I follow the same construction in deciding this motion.

Mantua Community Planners and Monroe also assert claims against Blackwell and the City based on a theory of respondeat superior for alleged tortious conduct by defendants' agents.  Id. at ECF p. 22-23.

Mantua Community Planners is a community organization that has existed in the Mantua neighborhood of Philadelphia since the 1960s.  Dkt. No. 22-2 at 6:5-18.  In 1978, Mantua Community Planners began using an office space at a newly built community center in Mantua. Id. at 14:15-16:3.  Around April 2011, the president of Mantua Community Planners passed away and members of the organization could not locate her key to the community center space. Id. at 7:5-9:5, 12:1-5.  Gerald Washington was appointed as the new president after her death and testified that he acquired a new key for the office.  Id. at 7:1-14; Dkt. No. 22-4 at 14:10-16:11.

Plaintiff Jenkins was one of the founders of Mantua Community Planners and led the organization as the chairman of the board.  Dkt. No. 22-2 at 7:1-14.  He testified that he had stored many personal items at the community center office over the course of his involvement with Mantua Community Planners.  Id. at 32:2-35:21.

Around May 2011, the locks were changed at the community center.  Id. at 27:13-17; Dkt. No. 22-4 at 20:6-22:2.  The Philadelphia Deputy Commissioner of Recreation and Programs testified that locks were changed at community facilities around the city at her instruction as part of a changing key access practice.  Dkt. No. 22-1 at 25:2-21, 33:3-17.  She maintains that she visited the office after the death of Mantua Community Planners' president, that the office appeared unused by anyone other than the past president and that the office was a "horrible mess."  Id. at 14:15-16:16.  She testified that she directed her staff to clean out the office three months later and that the clean-out process took an additional several months to complete.  Id. at 15:5-23, 18:3-23.

On November 16, 2011, defendant Blackwell, Gerald Washington and plaintiff Monroe all attended a community meeting in Mantua. Dkt. No. 22-4 at 36:13-39:18. At the meeting, Mr. Washington spoke during a question and answer session with Blackwell to discuss Mantua Community Planners' office space. Id. at 37:4-38:8. Monroe, who had no prior relationship with Mantua Community Planners, spoke at the meeting after she testified that she saw Blackwell "put a finger in [Mr. Washington's] face" and "saw people that looked like they were about to attack him." Dkt. No. 22-5 at 14:9-14, 18:21-20:18. She testified that after she spoke, she was surrounded by several people who threatened her and that shortly after, the meeting was shut down. Id. at 21:17-24:7.

Monroe maintains that after the meeting, Blackwell's staff member came up to her, gave her Blackwell's business card and told her that Blackwell wanted to talk to her. Id. at 25:14-27:16. Monroe claims that she went outside and went up to Blackwell's car to speak with her and that Blackwell hit her with her car after she approached the car on the driver's side. Id. at 30:15-35:1. Monroe testified that after the community meeting, she was subjected to repeated instances of threats, intimidation and harassment.[3] Id. at 49:16-50:16.

Defendants previously moved for judgment on the pleadings on numerous claims in plaintiffs' initial complaint. I granted judgment on the pleadings to defendants on plaintiffs' claims against both defendants under the Pennsylvania Constitution. I granted plaintiffs leave to amend their remaining claims to the extent that they could assert certain facts. Plaintiffs filed an

---

[3]    Plaintiffs allege that all of their losses stem from Blackwell's desire and corresponding actions to silence resistance against her opponents in the Mantua community for her own political and personal gain. Numerous documents and additional witnesses are referenced in the transcripts of plaintiffs' depositions that defendants submitted with their motion. However, plaintiffs have not supplied these documents to the Court and have attached no other evidence to their brief to add to the evidentiary record on summary judgment. Although plaintiffs' allegations are serious and troubling, they may not proceed to trial without a sufficient evidentiary or legal basis for each of their claims.

amended complaint and defendants filed an answer.[4]  See Dkt. Nos. 14 and 15.  The parties have

completed discovery.  Defendants now move for summary judgment on all claims.

### STANDARD OF REVIEW

Summary judgment will be granted "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party moving for summary judgment bears the burden of demonstrating that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden,

the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is

genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Id.  A fact is "material" if it might affect the outcome of the case under governing law.

Id.

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including
> depositions, documents, electronically stored information,
> affidavits or declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory answers,
> or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

---

[4]  Plaintiffs mention the Pennsylvania Constitution in their amended complaint; I
granted defendants judgment on the pleadings on all claims under the Pennsylvania Constitution
and did not give plaintiffs leave to amend those claims.  Thus, I have already addressed the
viability of plaintiffs' claims under the Pennsylvania Constitution and plaintiffs may not revive
them.  See Dkt. No. 11 at ECF p. 12-13.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  <u>Ely v. Hall's Motor Transit Co.</u>, 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

<u>DISCUSSION</u>

## I.    Section 1983 Claims

First, I will consider whether plaintiffs have met their burden on summary judgment with respect to their claims against either Blackwell or the City for constitutional deprivations in violation of 42 U.S.C. § 1983.[5]  <u>See</u> Dkt. No. 14 at ¶¶ 9-95.

### A.    Defendant Blackwell

Plaintiffs appear to claim that Blackwell is individually liable for several constitutional violations, including property seizure in violation of the Fourth and Fourteenth Amendments and infringement of their rights to free speech and to assemble under the First Amendment.[6]  Unlike

---

[5]    Although the headings in plaintiffs' amended complaint identify counts I, II and III as having been brought only on behalf of Mantua Community Planners and Monroe and not Jenkins, plaintiffs assert that Jenkins' property was lost or destroyed and that he was otherwise harmed as a result of defendants' alleged conduct.  <u>See</u> Dkt. No. 14 at ¶¶ 29, 31, 58-61, 73.

[6]    I have made my best attempt to comprehend and address the claims, arguments and positions in plaintiffs' amended complaint and brief in opposition to summary judgment. Many sections of plaintiffs' brief are difficult to follow because they are riddled with unsupported statements of fact and law and there are errors on every page.  Similarly, many aspects of plaintiffs' amended complaint are difficult to understand.

In plaintiffs' amended complaint, they allege section 1983 violations by both the City and Blackwell.  <u>See</u> Dkt. No. 14 at ECF p. 3, 11, 12.  In plaintiffs' brief addressing their section 1983 claims, they argue that they have shown "a viable cause of action against the City" without discussing Blackwell's individual liability.  Dkt. No. 23 at ECF p. 5.  Exercising an abundance of caution, I will address Blackwell's individual liability for alleged constitutional violations,

suits against officials in their official capacity, suits against officials in their personal capacity "seek to impose individual liability upon a government officer for actions taken under color of state law." Hafer v. Melo, 502 U.S. 21, 25 (1991).  A plaintiff seeking to impose individual liability on an official does not need to connect the official's actions to a "policy or custom." Id. "On the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985).

### 1.    Property Seizure[7]

Plaintiffs Jenkins and Mantua Community Planners claim that Blackwell is responsible for violations of the Fourth and Fourteenth Amendments for the disposal of their property from the community center.[8]  See Dkt. No. 23 at ECF p. 8-9.  As a threshold issue, individual liability under section 1983 can only be imposed if a state actor had "personal involvement in the alleged wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "Personal involvement can be shown through [evidence] of personal direction or of actual knowledge and acquiescence." Id.

The only evidence plaintiffs cite to connect Blackwell to the disposal of their property is Mr. Washington's account of a newspaper interview with Blackwell where she supposedly "admitted" that she was responsible for the lockout and disposal of property at the community

---

although plaintiffs make it far from clear which claims they are pursuing and against whom. Because "[s]uits against state officials in their official capacity . . . should be treated as suits against the [government entity]," I will address the City's liability for constitutional violations in the next section.  See Hafer v. Melo, 502 U.S. 21, 25 (1991).

[7]        Defendants argue that plaintiffs cannot succeed on a claim based on the Takings Clause of the Fifth Amendment; plaintiffs agree that they do not seek relief on this basis.  Dkt. No. 22 at ECF p. 13; Dkt. No. 23 at ECF p. 9.

[8]        Plaintiffs do not contend that this claim involves Monroe; only Jenkins and Mantua Community Planners had stored property at the community center.  See Dkt. No. 22-2 at 32:2-36:17; Dkt. No. 22-4 at 28:18-36:1.

center.  Dkt. No. 23 at ECF p. 7, <u>citing</u> Dkt. No. 22-4 at 50:4-12.  Plaintiffs have not provided

this article to the Court nor have they explained how it would constitute admissible evidence

even if it were before me.  To survive summary judgment, plaintiffs may not "rely on

unsupported allegations, but must go beyond pleadings and provide some evidence that would

show that there exists a genuine issue for trial."  <u>Jones v. United Parcel Serv.</u>, 214 F.3d 402, 407

(3d Cir. 2000).  Plaintiffs have failed to support their allegations of personal involvement by

Blackwell with any admissible evidence.  Thus, I will grant summary judgment to defendants on

plaintiffs' claims against Blackwell under the Fourth[9] and Fourteenth[10] Amendments.

---

[9]     Defendants argue that plaintiffs cannot sustain a Fourth Amendment claim
because they had no reasonable expectation of privacy at the community center.  Dkt. No. 22 at
ECF p. 14, <u>citing</u> <u>Keating v. Pittston City</u>, 446 F. App'x 492, 495 (3d Cir. 2011) (applying the
"reasonable expectation of privacy" standard in a section 1983 case involving allegations of
Fourth Amendment violations).  Defendants maintain that plaintiffs stored their property "in a
City-owned building in which numerous groups had access and the building supervisor
maintained a master key."  Dkt. No. 22 at ECF p. 14, <u>citing</u> Dkt. No. 22-1 at 33:12-24.
        Plaintiffs' only response is that the office was kept locked and that "there were no other
users of the area used by Mantua Community Planners."  <u>See</u> Dkt. No. 23 at ECF p. 9.  Plaintiffs
cite deposition testimony from the Deputy Commissioner of Recreation and Programs to support
their contention.  <u>Id.</u>  However, that testimony only discusses Mantua Community Planners' use
of the space, not whether anyone outside of Mantua Community Planners could access the space
with keys.  <u>See</u> Dkt. No. 22-1 at 14:20-15:4 (testifying that "prior to [the lockout] the room was
not being used by anyone, for the most part, other than [the past president of Mantua Community
Planners]"), 21:6-20 (testifying that "[f]rom what I understood . . . the only activity that was
going on up [in the office] was [the past president's].  Now, was she using the phone to conduct
business?  I don't know.  Did she have people there, and I did not know?  That's a
possibility . . .").  This testimony is insufficient to meet plaintiffs' burden on summary judgment.
[10]     Plaintiffs mention the Fourteenth Amendment only once in their initial and
amended complaints, in the jurisdiction/venue section, without then citing it as the basis for any
particular claim.  <u>See</u> Dkt. No. 1 at ¶ 7; Dkt. No. 14 at ¶ 7.  It is not clear if plaintiffs actually
brought or intended to bring such a claim — defendants discuss it because they "broadly
interpret" plaintiffs' claims stemming from the property destruction.  <u>See</u> Dkt. No. 22 at ECF p.
13.  I include it here to ensure that no issues remain outstanding in this case.
        Defendants argue that plaintiffs cannot sustain a Fourteenth Amendment claim because
plaintiffs failed to take advantage of a meaningful post-deprivation proceeding.  <u>Id.</u> at ECF p. 14-
15.  Defendants cite evidence suggesting that plaintiffs could have applied for a permit to access
the facility after their property was removed.  <u>Id.</u>  As plaintiffs point out, the ability to apply for a
permit to access the community center — from which plaintiffs' property had already been

2.      **Free Speech**[11]

a.      **Mantua Community Planners**

Mantua Community Planners asserts a First Amendment retaliation claim against

defendant Blackwell.[12]  To withstand summary judgment, it must prove: "(1) that [it] engaged in

constitutionally-protected activity; (2) that the government responded with retaliation; and (3)

that the protected activity caused the retaliation."  Eichenlaub v. Twp. of Indiana, 385 F.3d 274,

282 (3d Cir. 2004), citing Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997).  Where, as here,

plaintiff is a private citizen and not a public employee, the speech need not address a matter of

public concern in order to qualify as protected speech.  Eichenlaub, 385 F.3d 274 at 282.

However, merely showing that a defendant "set[] in motion a series of acts by others which the

actor knows or reasonably should know would cause others to inflict [a] constitutional injury"

will not be sufficient to satisfy the causation element of a retaliation claim.  See Grimm v. City

of Uniontown, No. 06-1050, 2008 WL 282344, at *25 (W.D. Pa. Jan. 31, 2008).

Defendants contend that Mantua Community Planners has not supported its retaliation

claim with any evidence indicating that the organization's property was disposed of after a lock-

out in retaliation for an act of protected speech.  Dkt. No. 22 at ECF p. 13.  They note that the

---

removed — can hardly be characterized as a post-deprivation hearing about the removed
property.  Nonetheless, without any evidence linking Blackwell to the destruction of their
property, plaintiffs cannot proceed to trial against Blackwell on this claim.

[11]      Jenkins testified that he did not attend the November 2011 community meeting
and there is no evidence indicating that his freedom of speech was infringed upon by either
defendant, so I will only discuss the claims brought by Mantua Community Planners and
Monroe.  See Dkt. No. 22-2 at 47:7-17.

[12]      I previously construed Mantua Community Planners' free speech claim as one for
First Amendment retaliation.  Dkt. No. 11 at ECF p. 6.  Neither plaintiffs' brief nor their
amended complaint suggests a different interpretation.  See Dkt. No. 14 at ¶¶ 21-28, 39-47, 76-
80; Dkt. No. 23 at ECF p. 6-8.  To the extent that plaintiffs seek to pursue a freedom of speech
claim based on Mantua Community Planners' president's speech at the November 2011
community meeting, Mr. Washington testified that Blackwell did not prevent him from speaking
at the meeting.  Dkt. No. 22-4 at 47:3-21.

Deputy Commissioner of Recreation testified that the locks at the community center were changed as part of an initiative to prevent unauthorized use of City-owned community buildings. Id., citing Dkt. No. 22-1 at 25:14-21.

Mantua Community Planners responds that it had used the community center from 1978 until the lockout in 2011, when Jenkins appointed Gerald Washington as interim president after the death of the organization's previous president.  Dkt. No. 23 at ECF p. 7.  Without citing any evidence, Mantua Community Planners argues that Blackwell wanted a different person to be its president and that she ordered the lockout and the disposal of its property "to punish her political opponents" for her own benefit.  See id. at ECF p. 7-8.

Mantua Community Planners argues that "Councilwoman Blackwell does not tolerate opposition to her viewpoint" and that "[o]nly Mantua Community Planners were vocal opponents to her plans in Mantua."  Id. at ECF p. 8.  To support this argument, Mantua Community Planners cites Jenkins' testimony describing a statement within a newspaper article about the president of Drexel University which Jenkins believed to be proof of a "conflict of interest" between Blackwell and another community organization.[13]  Dkt. No. 22-2 at 21:4-23:9. Jenkins' testimony does not identify any protected speech by Mantua Community Planners that could be linked to the lockout.  Mantua Community Planners also contends that when its previous president passed away, "Councilwoman Blackwell seized the opportunity to eliminate Mantua Community Planners' opposition . . . by ordering the City workers to throw away all of Mantua Community Planners['] property and office equipment and to lock them out of the building."  Dkt. No. 23 at ECF p. 8.  Mantua Community Planners maintains that "[t]his situation

---

[13]     Even if this evidence were relevant, Mantua Community Planners does not cite a hearsay exception that would make this evidence admissible and therefore appropriate to rely upon at summary judgment.

clearly satisfies the criteria" for a First Amendment retaliation claim, without conducting any legal analysis.  Id.

The only evidence Mantua Community Planners cites to support its claim does not establish any protected speech before the lockout occurred that could have been the basis for retaliation.  Also, Mantua Community Planners has not provided any evidence linking Blackwell to the lockout and property disposal.  Defendants are therefore entitled to summary judgment on Mantua Community Planners' claim for First Amendment retaliation.

>    **b.    Monroe**

Monroe also asserts a claim against Blackwell for violations of her First Amendment right to free speech.  Monroe testified at her deposition that she attended and spoke at the November 2011 community meeting.  Dkt. No. 22-5 at 18:4-25:13.  She claims that Blackwell told her to "shut up" at the meeting but that she kept talking until the meeting was over.  Id. at 21:5-25:7.  Monroe stated that once the meeting was over, Blackwell struck Monroe with her car when Monroe went to talk to her.  Id. at 30:15-35:1.  Monroe also testified that in the aftermath of the community meeting,

> [o]n many occasions there were people walking around the neighborhood inquiring about me, asking my neighbors, asking people who lived on other streets around me, just trying to get information on me.  Late at night in the evenings people were banging on my door, screaming my name, screaming my dog's name. . . . There was a note put under my door that said, "You're next."  And it was written on a business card of Wally's store.  A murder had just occurred at that corner that night . . . . I found a dead dog on my doorstep, and there were bullet casings put on my door.  I'd walk down the street and people would tell me, "Watch your back.  You better watch your back."  So I moved.  And when I moved they followed me.  Showed up right outside of my house again, took pictures of my house, took videos of me. . . .

Id. at 49:16-50:16.  She testified that she could not identify any of the people who followed,

threatened or watched her.  Id. at 51:3-15.  Monroe also maintains that one day when she was crossing the street, a former "Parks and Recreation" employee almost hit her with his car and yelled at her, identifying her as being involved with a lawsuit against Blackwell.  Id. at 51:24-52:18.  However, Monroe testified that no one told her that Blackwell had anything to do with these incidents and when asked if she had any reason to believe that Blackwell was connected to these incidents she said, "I don't know."  Id. at 61:3-62:22.

In response to defendants' motion, plaintiffs do not address Monroe's free speech claim for her comments at the community meeting.  There is no evidence before me that Blackwell or any person working for Blackwell actually prevented Monroe from speaking at the community meeting that could sustain a claim that Blackwell violated Monroe's right to free speech. Instead, the bulk of Monroe's testimony goes to a First Amendment retaliation claim, suggesting that Blackwell retaliated against her for her speech at the community meeting by hitting Monroe with a car and then harassing her through third parties.  Defendants argue that Monroe has failed to demonstrate a causal connection between any conduct by Blackwell and any incidents that occurred to Monroe after she spoke at the community meeting.  Dkt. No. 22 at ECF p. 11-13.  To establish causation in a First Amendment retaliation claim, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  Defendants maintain that Monroe has "fail[ed] to attribute any particular act" to Blackwell and instead "claims that they must have been carried out at Blackwell's behest."  Dkt. No. 22 at ECF p. 12.

Plaintiffs do not address Monroe's retaliation claim in their response to defendants' motion or otherwise defend against defendants' construction of the facts.  After my own review

of the record, I note that Monroe provided some additional testimony about these incidents.  She never directly testified that Blackwell was responsible for the harassment she experienced after the community meeting but insinuated that the incidents were connected to Blackwell based on temporal proximity.  See Dkt. No. 22-5 at 69:3-9, 69:22-70:7, 99:15-100:1.  Only some of the incidents Monroe testified about were linked to dates; several of the incidents appear to have happened months, or even over a year, after the community meeting.  See id. at 97:21-101:23, 102:4-103:6.

However, even if plaintiffs could point to evidence connecting Blackwell to any of the incidents with Monroe beyond the car accident — which they have not done — there is no evidence that Monroe's retaliation claim meets the initial requirement that Blackwell acted "under color of law."  "[S]tate action is a threshold issue in any section 1983 case." Bonenberger v. Plymouth Twp., 132 F.3d 20, 23 (3d Cir. 1997).  In section 1983 cases, "not all torts committed by state employees constitute state action, even if committed while on duty."  Id. at 24.  Rather, "the essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state." Id.  Thus, to be liable under section 1983, a defendant must "have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  Id. at 23 (internal citations and quotation marks omitted).

There is nothing before me to demonstrate a connection between any of Blackwell's purported actions and the powers or duties of her office as a City councilperson.  Although plaintiffs repeatedly assert that Blackwell acted under color of law, they have not set forth any evidence to support their position.  Therefore, even assuming that Blackwell hit Monroe with her car or even if defendants could connect any of the other incidents claimed by Monroe to

Blackwell, her claims cannot withstand defendant's motion for summary judgment on Monroe's First Amendment claim.

### 3.      Assembly

Plaintiffs assert that defendants infringed on their First Amendment right to assemble. Dkt. No. 14 at ¶¶ 76-80.  The First Amendment protects an individual's right to expressive association.  <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 622 (1984).  Specifically, it protects the rights of individuals to: (1) "enter into and maintain certain intimate human relationships" absent undue government interference; and (2) "engag[e] in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion."  <u>Id.</u> at 617-18.

Defendants argue that plaintiffs' freedom of assembly allegations have no support in the factual record.  Dkt. No. 22 at ECF p. 10-11.  Plaintiffs' response to defendant's motion does not address their freedom of assembly claims.  They cite no evidence to rebut defendants' argument.[14]  As plaintiffs do not oppose defendants' argument and there does not appear to be evidentiary support for their freedom of assembly claims, I will grant summary judgment in favor of defendants on those claims.

### B.      Defendant City of Philadelphia: Monell Liability

Plaintiffs seek to hold the City liable for claimed constitutional violations perpetrated against them by municipal employees.[15]  <u>See</u> Dkt. No. 23 at ECF p. 5.  Plaintiffs maintain that

---

[14]      In fact, Jenkins testified at his deposition that Mantua Community Planners can meet at the community center now if they wanted to do so, but that the members "don't want meetings as much as we want our office."  Dkt. No. 22-2 at 29:11-15.

[15]      Plaintiffs argue that defendants have conceded the viability of their section 1983 claims "at page 10 of their Memorandum of law re their Motion to Dismiss pursuant to Rule 12."  Dkt. No. 23 at ECF p. 6.  As defendants never filed a motion to dismiss in this case, it is unclear to which document plaintiffs might be referring; neither page 10 of defendants' brief in support

they can sustain a claim for municipal liability against the City for the claimed violations of their

constitutional rights under a theory of respondeat superior.  Id. at ECF p. 11.

It is well established that there is no section 1983 liability based on respondeat superior.

Stewart v. Phila. Hous. Auth., 487 F. Supp. 2d 584, 591 (E.D. Pa. 2007).  Rather, in order to

establish the City's liability for a claim pursuant to section 1983, plaintiffs must demonstrate that

the City implemented a policy or custom that caused the alleged constitutional violation.  See

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978).  Defendants argue that plaintiffs have

failed to identify or provide any evidentiary support for a policy or custom that caused the

constitutional violations which plaintiffs claim.  Dkt. No. 22 at ECF p. 8-10.

Indeed, plaintiffs do not discuss Monell in their response to defendants' motion and

identify neither a policy or custom nor any evidence supporting the existence of a policy or

custom that could have caused the constitutional violations which they claim.  Instead, plaintiffs

argue that "Councilwoman Blackwell [is] a policy maker of the City/County" and she "ordered

the destruction of [p]laintiffs['] property[,] conducted the activities to destroy [p]laintiffs'

organization[,] silence[d] its political opposition to her programs and harass[ed] [p]laintiff

Monroe or stood by and let the activities occur."  Dkt. No. 23 at ECF p. 5.  Merely alleging

constitutional violations on the part of a city employee is insufficient to support a claim of

municipal liability.  Id. at 691.  Rather, plaintiffs must show that the City "acted deliberately and

was the moving force behind the deprivation" and that their injuries were "caused by the

identified policy or custom."  Pelzer v. City of Phila., 656 F. Supp. 2d 517, 531-32 (E.D. Pa.

2009).  Plaintiffs have not set forth any evidence to satisfy this requirement.

Plaintiffs also maintain that "[t]he City knew or should have known of [d]efendant

---

of their motion for judgment on the pleadings nor page 10 of their brief in support of summary
judgment contains such an admission.  See Dkt. No. 8 at ECF p. 10; Dkt. No. 22 at ECF p. 10.

Blackwell's habitual conduct of intimidating political opponents and her influence over the police force especially where community activities and auto accidents were involved" and that "[t]hese [constitutional] violations were clear to any objective official and City officials" Id. at ECF p. 5-6.  They argue that "the City has remained deliberately indifferent" to Blackwell's conduct which gives rise to municipal liability.[16] Id.  They contend that "the City was either intimidated into assisting [d]efendant Blackwell and/or willingly participated in the violations of defendants' rights and destruction of their property." Id.  These arguments are likewise insufficient to establish that a material question of fact remains with respect to their section 1983 claim against the City.[17]  Because plaintiffs have failed to identify or support any basis for municipal liability against the City under section 1983, I will grant summary judgment for defendants on plaintiffs' section 1983 claims.

## II.      Negligence

Defendants argue that they are entitled to summary judgment on Monroe's claims based on Blackwell's alleged negligence because the City and its employees are absolutely immune from suit for negligence.  Dkt. No. 22 at ECF p. 16-17.  Defendants previously sought judgment on the pleadings on Monroe's negligence claim against the City and I found that the City was entitled to immunity unless its conduct fell under one of eight enumerated exceptions in the Pennsylvania Political Subdivision Tort Claims Act.  See Dkt. No. 11 at ECF p. 14, citing 42 Pa. Cons. Stat. § 8542(b).  I also found that, subject to the same exceptions, the PSTCA would

---

[16]      Plaintiffs cite one case to support their argument; it discusses deprivations of rights in the context of "deliberate indifference to a person's medical needs by a custodial official acting under color of state law." Davis v. City of Phila., 650 A.2d 1127, 1130 (1994).

[17]      Plaintiffs also appear to argue that certain exceptions to governmental immunity within the Pennsylvania Political Subdivision Tort Claims Act would result in municipal liability for the disposal of their property at the community center.  See Dkt. No. 23 at ECF p. 10-11. This Pennsylvania statute which applies to state law tort claims is irrelevant to the City's liability for plaintiffs' alleged constitutional violations.

immunize Blackwell from liability in her official capacity.[18]   Dkt. No. 11 at ECF p. 13 n.7.

Plaintiffs contend that defendants can be held liable for negligence because the PSTCA contains an exception for damage to personal property which is under the care, custody or control of a municipal entity and that this provision applies to the destroyed property of Mantua Community Planners and Jenkins.  Dkt. No. 23 at ECF p. 10-11.  However, plaintiffs have not brought a negligence claim against either the City or Blackwell for the disposal of their property at the community center; the only negligence claim in the amended complaint arises out of the incident where Blackwell allegedly struck Monroe with her car.  See Dkt. No. 14 at ¶¶ 96-116. Thus, the damage to personal property exception is inapplicable here.

Plaintiffs also devote a single sentence to their argument that the City can be held liable

_____

[18]       I had assumed in my prior opinion that Monroe was pursuing a negligence claim against Blackwell in her individual capacity rather than in her official capacity, although plaintiffs did not specifically state this.  See Dkt. No. 11 at ECF p. 13 n.7.  Neither party has addressed the viability of a negligence claim against Blackwell in her individual capacity since then.

Plaintiffs' amended complaint does not clarify the type of claim Monroe is pursuing but, without addressing her individual liability, her negligence count makes numerous references to Blackwell's actions in her official capacity as a City councilperson or as a City employee.  See Dkt. No. 14 at ¶¶ 97-104.  Plaintiffs note in the part of their amended complaint alleging section 1983 violations that they "believe that some of the actions and/or inactions of . . . Blackwell were done in her official capacity as a Councilperson . . . and some were done on her own."  Id. at ¶ 63.  However, plaintiffs do not explain when they believe Blackwell acted in her official capacity as opposed to her individual capacity.  The only relevant argument plaintiffs make regarding their negligence claim is that the City can be liable for Blackwell's actions in her capacity as a municipal employee through the vehicle liability exception to the PSTCA.  See Dkt. No. 23 at ECF p. 11.  Because plaintiffs have said nothing since my prior opinion to establish that Monroe seeks to hold Blackwell personally responsible for the alleged car accident, I can only assume that she does not pursue such a claim in her amended complaint.

Further, even if Monroe seeks to hold Blackwell personally liable for negligence, she has not cited evidence or authority supporting such a claim.  See Farabaugh v. Pa. Tpk. Comm'n, 911 A.2d 1264, 1272-73 (Pa. 2006) ("In any case sounding in negligence, a plaintiff must demonstrate: (1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff.").  Thus, as defendants have moved for summary judgment on all of plaintiffs' claims, defendants would be entitled to summary judgment on this claim as well.

under the vehicle liability exception at 42 Pa. Cons. Stat. § 8542(b)(1) for Monroe's injuries as a result of the alleged car incident with Blackwell.  Dkt. No. 23 at ECF p. 11.  That exception provides that a local entity can be held liable for "[t]he [negligent] operation of any motor vehicle in the possession or control of the local agency."  42 Pa. Cons. Stat. § 8542(b)(1).  It only applies to an injury "caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties."  42 Pa. Cons. Stat. § 8542(a)(2).  Plaintiffs do not cite any evidence to support application of this exception to the City; merely stating its existence is insufficient for their negligence claims against the City to survive summary judgment.

Plaintiffs have not met their burden to support their negligence claims under either a theory of direct liability or a theory of respondeat superior.  I will grant summary judgment in defendants' favor on Monroe's negligence claims.

## III.   Intentional Infliction of Emotional Distress

Plaintiff Monroe has asserted a claim of intentional infliction of emotional distress against defendants based on alleged "physical threats to her wellbeing, mental torture and harassment."  Dkt. No. 14 at ¶ 118.  In Pennsylvania, to establish a prima facie intentional infliction of emotional distress claim, a plaintiff must show that:  (1) a person's extreme and outrageous conduct (2) intentionally or recklessly caused (3) severe emotional distress to another.  See, e.g., Manley v. Fitzgerald, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010).  Defendants argue that Monroe has "failed to establish any material evidence that [d]efendant Blackwell, in her individual capacity or through her position on City Council, caused emotional distress to Plaintiff Monroe."  Dkt. No. 22 at ECF p. 17.  A plaintiff must support a claim for intentional infliction of emotional distress with competent medical evidence.  Kazatsky v. King David Mem'l Park, Inc., 527 A.2d 988, 995 (1987).  The Supreme Court of Pennsylvania has

explained that "it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually suffered the claimed distress."  Id.

Here, the amended complaint updated Monroe's allegations to include injuries she suffered.  See Dkt. No. 14 at ¶ 120.  However, plaintiffs' brief in opposition to summary judgment simply rehashes some of the allegations in the amended complaint without citing to evidence.  See Dkt. No. 23 at ECF p. 11-12.  Once more, plaintiffs' recital of unsupported allegations fails to meet their burden at summary judgment.  Because Monroe has not provided competent medical evidence to establish direct or respondeat superior liability for her intentional infliction of emotional distress claim, defendants are entitled to summary judgment.

An appropriate Order follows.